In the Matter of the ESTATE of EDWARD H. JOHNSON, Deceased

(71 N. W.2d 77)

(File No. 9485.   Opinion filed June 15, 1955)

**Bogue & Masten,** Canton, **Walter C. Miller,** Plankinton, for Appellant.

**Danforth, Bleeker & Carlson,** Mitchell, for Respondent.

SMITH, J.   Henry E. Johnson was appointed administrator of the estate of Edward H. Johnson in October 1938. He did not make an accounting until July 1951.   He then filed his final account and petition for final distribution.   Objections to this account were filed by one of the heirs. Hearing on the account was had and findings, conclusions and decree adverse to the administrator were made and filed.   He appealed to the circuit court.   A trial de novo was had and resulted in findings, conclusions and decree adverse to the administrator.   He has appealed to this court.

The principal question presented for our consideration is whether the circuit court erred in adjudging that the administrator holds title to a described quarter section of Aurora county land in trust for the heirs. This holding of the circuit court is predicated upon a finding that the administrator "purposely and unlawfully used the assets of said estate for his own personal gain and for the purpose and intent of obtaining the title to said real estate hereinbefore described, and in bad faith, contrary to his trust and in violation thereof and contrary to the interests of the beneficiaries." The administrator contends that the evidence is insufficient to sustain this specific finding, and that the findings as a whole fail to sustain the court's conclusion that this quarter section is held by him in trust.

The assets of the estate consisted of $148 in cash; a 1924 Buick automobile and trailer; a promissory note of O. P. Johnson, one of the heirs, for $1,000 on which $325 had been paid; a promissory note of one Erickson for $5,000 secured by real estate mortgage; a house and lot in Mount Vernon, South Dakota; a quarter section of Aurora county land, above mentioned, encumbered by a $2,000 school fund mortgage to Aurora county. No creditors' claims were filed.

The deceased, hereinafter referred to as the father, was survived by eight children by a first marriage, and his widow, a second wife.

To present a factual background against which to view the issue, we deal with the assets separately.

The $148 in cash was used to open an estate account in a Mitchell bank in which the administrator carried a personal account.

The automobile and trailer were sold for $140 and the proceeds were turned over to the widow.

The O. P. Johnson note remains uncollected as an asset of the estate.

In satisfaction of the Erickson note and mortgage the administrator received $6,022.82 as follows: 1938, $250; 1939, $150; 1940, $250; 1941, $250; and 1942, $5,122.82.

The Mount Vernon house was old and in a bad state of

repair. It was appraised at $500. The father made his home there prior to his death and his widow continued to live there about two months after his death. It did not rent easily or profitably. The administrator occupied it from 1947 to the fall of 1951 at a rate of $15 per month. It produced $1,610 in rentals, and disbursements for taxes, insurance and repairs thereon equalled $1,402.57.

The Aurora county quarter section, which we refer to as the farm land, is described as a rough piece of land much of which is underlayed with deep gravel, covered by a thin topsoil. Firesteel Creek cuts it in two places, and a draw extends into its center. This draw is sometimes impassable. It contains about 120 acres of cropland. At the time of the death of the father taxes were in default including the 1936 tax, and interest was past due. The administrator made no payments of taxes, interest or principal and the county foreclosed in 1941 for $2,831.39. The county purchased the land at the foreclosure sale for that amount and received a sheriff's deed in 1942. It is undisputed that this farm was worth no more than $1,000 during the foreclosure and redemption period. In 1945 the county offered this farm for sale at public auction, and the administrator, acting as an individual, became the successful bidder at a figure of $2,400. Thereupon he entered into a contract of purchase with the county payable over a term of years. In 1946 he paid up his contract and received a deed to himself as an individual. His payments to the county were made from a personal account in a Plankinton bank.

A real estate dealer valued this farm at $55 per acre at the time of trial in circuit court.

The administrator is a son of the deceased. Some years before his father's death, he acquired a quarter section adjoining his father's farm land. He lived on his own quarter and operated his father's quarter. One of the heirs testified that the administrator had admitted at a time before the father's death that he was renting on shares from his father. The year of this admission was left in doubt. The administrator testified that his father paid him for the seed, oil, gas, labor and machine hire, and took all of the crop.

The father died in July and the administrator was appointed on the 27th day of October 1938. Because of the years of drouth farming was at low ebb. The administrator made little effort to rent the farm. He did succeed in renting 40 acres for corn, but the grasshoppers destroyed the crop. He testified that he determined to carry on as he had operated for his father. His report of his operations for 1938 to 1942 inclusive show an income of $1,085.17 and disbursements of $1,312.50. The circuit court found him guilty of self-dealing and surcharged his account with the reasonable rental of the farm during 1938 to 1942 inclusive, as follows: 1938, $450; 1939, $250; 1940, $200; 1941, $250; and 1942, $400. It also surcharged his account for reasonable rent of the farm for the years 1946 to 1953 inclusive in a total sum of $5,300.

At the outset the administrator carried an estate account and a personal account in a Mitchell bank. Eventually the estate account was closed and estate income was deposited in the described personal account. During the early years his disbursements for expenses of the estate and advances he was making to the widow exceeded his actual cash receipts. After the Erickson payments were completed the administrator distributed $4,500 among the heirs. Most of this distribution was made during 1943 and 1944. From the widow's share, the administrator withheld his previous advancements. However, his total payments for the widow amounted to $1,715, including payment of her funeral expenses June 4, 1946 of $350. When he handed one of his brothers a check for his share of the distribution on March 27, 1943, he stated he had received $4,500 in settlement of the Erickson note and mortgage.

In his final account the adminstrator failed to report his operating income and disbursements on the farm. He also misrepresented his receipts on the Erickson note and mortgage. He stated in his report that he had satisfied that mortgage for $4,500. In fact he had received a total of $6,022.82 from the Ericksons in principal and interest. He filed two supplemental reports after he was examined in county court. In the one report he accounted for his farming operations as

above described. In the other he accounted for the additional payments by the Ericksons.

The basic contention of the heirs is the even though the administrator acted in the utmost good faith and was fully justified in permitting the county to acquire title to this farm land through the foreclosure of its mortgage, nevertheless the conclusion of the circuit court must be upheld because an administrator while so acting, is not permitted to purchase, in his individual capacity, that which had been estate property.

██ ██ This contention is grounded in part on SDC 35.1502 reading: "No executor or administrator may, directly or indirectly, purchase any property of the estate he represents, nor may he be interested in any sale." In our opinion this section is not controlling in the circumstances under consideration. It came into our law as Section 209, Revised Probate Code of 1877, as a part of a chapter dealing with sales of real estate in probate proceedings, and it has so remained throughout the revisions of our statutes until 1939 when it was placed in SDC 35.15, a chapter which governs sales of both real and personal property in probate. We have been unable to discover an indication that the legislature had more in mind than to inhibit an executor or administrator from furthering any personal interest in connection with probate sales. However, it is undoubtedly true, as indicated in § 344, Brancroft Probate Practice, 2d Ed., that this section deals with an aspect of the fundamental duty of loyalty and fidelity owed by every trustee to his beneficiary. Cf. Restatement, Trusts, § 170, and Scott on Trusts, § 170. It is to this far-reaching doctrine that the heirs turn as further authority for their position stated supra. As applied to purchases by a trustee, that doctrine is expressed in SDC 59.0107 in these words: "A trustee may not in any manner use or deal with the trust property for his own profit or for any other purpose unconnected with the trust." Cf. Robinson v. Roinstad, 43 S.D. 436, 180 N.W. 67.

Cases in which this universal principle has been applied to purchases by a trustee of trust property are collected in an annotation in 77 A.L.R. 1513. We have given those cases

consideration. The cases which the heirs urge as most determinative of the problem we are now considering are those which adopt the majority rule that prohibits a trustee from purchasing estate property at a sale by a third person. Those cases would be in point if the administrator in our case had purchased at the sale by the sheriff in foreclosure of the mortgage of Aurora county. We would then have the question this court did not decide in Stianson v. Stianson, 40 S.D. 322, 167 N.W. 237, 6 A.L.R. 280. The rationale which supports those cases is clearly summarized by Scott on Trusts, § 170.5, p. 865, as follows:

> "Here, as in all these situations, if the trustee were permitted to purchase there would be a conflict between his duty to the beneficiaries and his self-interest; and the rule prohibiting purchase by him for himself removes the danger of such a conflict. If he were permitted to purchase the property, there would be a temptation not only to encourage the sale of the property, but to discourage other bidders. As trustee it is his duty to see that the property is sold for the highest possible price; as a purchaser it would be to his interest that the property should be sold for the lowest possible price. * * *"

Under the assumptions against which we are now viewing this case, it appears that at the time of the sale of this farm land as the property of Aurora county, although the administrator was continuing as such, the farm had been withdrawn from the trust. He was then under no duty to the heirs in connection with this farm. For that reason the rationale of the above mentioned majority cases loses much of its force. The only reason for prohibiting an administrator from purchasing at such a sale would be for the purpose of removing any possible temptation to permit the original foreclosure in the hope that he might later acquire the property with advantage to himself. Such reasoning justifies the repetition of the observation of Mr. Justice Hunt in Stephen v. Beall, 22 Wall. 329, at page 340, 89 U.S. 329, at page 340, 22 L.Ed. 786, as follows:

> "It would, however, be a great straining of a good principle to hold that a purchase by a trustee from the purchaser at a public sale under the circumstances before us, is necessarily fraudulent."

For the same reason, we think sound public policy does not require that such a remote purchase be prohibited under factual circumstances we have assumed.

The way to sound decision in a case involving such a purchase by a trustee as we are considering is suggested in comment e to § 170, Restatement, Trusts, reading as follows:

> "* * * If the trustee sells to a third person for the purpose of repurchasing the property from the third person, although at the time he has no understanding with the third person as to the repurchase, he commits a breach of trust, and if he subsequently reacquires the property he can be compelled to hold it subject to the trust (see § 320). If, however, the sale is made to a third person without such an understanding and without such a purpose, a subsequent purchase by the trustee from the third person does not render the trustee liable. The fact that the trustee subsequently repurchases the property may be under some circumstances evidence that in making the sale he was not acting for the sole benefit of the beneficiary and therefore was committing a breach of trust."

It is our view that, if the administrator acted in good faith in dealing with this farm land, that is to say, if his refusal to pay taxes and interest, or to redeem, was not for the purpose of acquiring the land for himself, he was not prohibited from purchasing as an individual at the subsequent county sale, even though he continued to act as administrator of the estate.

Thus we come to a consideration of the sufficiency of the evidence to support the finding of the circuit court quoted supra to the effect the administrator acquired title to the farm land through actual fraud and bad faith. As we have

held his acquisition of this land is not open to question unless he permitted the county to take title in furtherance of a design to gain the land for himself, our inquiry is whether the evidence warrants a finding that he acted in bad faith or fraudulently in connection with the mortgage of Aurora county.

■ ■ Much is contained in the record which opens the administrator to censure, but almost nothing therein is indicative of the purpose found by the court. He surely did not act with reasonable dispatch in administering and in closing the estate. He failed to account, or to keep the court and the heirs conversant with his dealings. He mingled estate funds with his own funds. He moved into the Mount Vernon home, and he may have rented the farm land to himself as the court found. Surely by 1943 he had made up his mind to conceal from the rest of the heirs that he had succeeded in collecting the Erickson note in full and to cheat them out of their full share of that fund. While these facts urged by the heirs may afford an insight into the character of the administrator and suggest a predisposition to serve his own interests, they do not impress us as having any real tendency to establish a purpose to use the assets of the estate to gain title to the farm land as found by the court. The fact that he owned an improved adjoining quarter and therefore may have entertained a hope he could eventually acquire this farm land, plus the fact that he later was able to purchase it at a figure he was then willing to pay, excites suspicion and would become of controlling significance were it not for the stubborn fact that the circumstances in which he acted from 1938 to 1942 afforded him no choice of courses. In dealing with the mortgage held by Aurora county he was under a duty to employ that prudence which an intelligent person of ordinary judgment would observe in the management of his own affairs. Cf. 33 C.J.S., Executors and Administrators, § 247, page 1255. Although he had funds in hand which would have made it possible for him to redeem, the land was then so undesirable and of so little value that neither a redemption nor a payment of the amount necessary to secure a two-year extension of the period of redemption under SDC 37.3010 could have been justified as a matter of

sound business judgment. Thus it appears that he followed the only course open to him. The fact that so doing proved to be of ultimate advantage to him cannot be permitted to control our decision. His conduct must be interpreted in the light of the circumstances in which he acted. Because his decision was impelled by circumstances beyond his control we are convinced that the finding of the trial court is against the clear weight of the evidence.

An analogous issue was before the court in Costello v. Costello, 209 N.Y. 252, 103 N.E. 148, at page 152, and caused it to say:

"The question whether or not the trustees were culpably negligent should be determined with reference to the situation at the time the sale to John H. was made, and not in the light of such subsequent events as could not, through compliance with their duty, have been anticipated. A wisdom developed after an event, and having it and its consequences as a source, is a standard no man should be be judged by."

In view of the foregoing we are of the opinion that the remaining assignments need not be considered.

Th judgment of the trial court is reversed.

All the Judges concur.